# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**MICHAEL E. SIMMONS**
**ANDREW P. WIRICK**
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**SUSAN E. CLINE**
**EDWARD J. FUJAWA**
Lewis Wagner, LLP
Indianapolis, Indiana

FILED

Jul 15 2014, 10:24 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| REBECCA STAFFORD, Individually and as Surviving Parent of DRAYDEN POWELL, Deceased, and DRAYDEN POWELL, Deceased, <br><br> Appellants-Plaintiffs, <br><br> vs. <br><br> JAMES E. SZYMANOWSKI, M.D. and GYN, LTD., INC., <br><br> Appellees-Defendants, <br><br> And <br><br> JOSEPH B. CLEMENTE, M.D., <br><br> Appellee-Defendant. | No. 89A01-1401-CT-48 |

APPEAL FROM THE WAYNE SUPERIOR COURT
The Honorable Gregory A. Horn, Judge
Cause No. 89D02-1209-CT-33

**July 15, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellants-Plaintiffs, Rebecca Stafford, Individually and as Surviving Parent of Drayden Powell, Deceased (Stafford) and Drayden Powell, Deceased (Drayden) (Collectively, Appellants), appeal the trial court's summary judgment in favor of Appellees-Defendants, Joseph B. Clemente, M.D. (Dr. Clemente)[1]; James E. Szymanowski, M.D. (Dr. Szymanowski); and GYN, Ltd., Inc. (GYN) (Collectively, Appellees) with respect to Appellants' medical malpractice claim.

We affirm.

## ISSUES

Appellants raise three issues on appeal, which we restate as:

(1) Whether the trial court properly concluded that the testimony of Appellants' expert witness did not create a genuine issue of material fact as to the liability of Dr. Szymanowski;

(2) Whether the trial court properly concluded that the alleged negligence of a physician qualified under the Indiana Medical Malpractice Act cannot be imputed upon the corporate Appellee, GYN, under a theory of vicarious liability; and

(3) Whether the trial court properly concluded that no recovery can be had for the 2007 death of a child not born alive under the Child Wrongful Death Statute.

## FACTS AND PROCEDURAL HISTORY

---

[1] Dr. Clemente was voluntarily dismissed as a party from the action prior to the trial court's ruling on the Appellees' motion for summary judgment.

Stafford became pregnant with her third child in 2007. She received prenatal medical care from Appellees from approximately March of 2007 until Drayden was stillborn on November 6, 2007. Stafford alleges that Drayden's death *in utero* and stillbirth resulted from Appellees' negligence and medical malpractice at a time when Drayden was a viable fetus, and specifically from certain medical acts and omissions which occurred between October 6, 2007 and November 6, 2007.

On June 2, 2009, Stafford filed a Proposed Complaint for Medical Malpractice with the Indiana Department of Insurance. On October 23, 2009, an amended complaint was filed, adding Drayden, a child not born alive, as a party, and submitted to the Medical Review Panel (Panel) pursuant to Ind. Code § 34-18-10-1. On May 30, 2012, the Panel issued its expert opinion, concluding "that the evidence does not support the conclusion that the [Appellees] failed to meet the applicable standard of care, and that their conduct was not a factor of the resultant damages." (Appellants' App. p. 31).

On August 3, 2012, following the Panel's opinion, Appellants filed their Complaint for Medical Malpractice before the trial court. On September 21, 2012, Appellees tendered a motion for summary judgment as a matter of law because Appellants had failed to establish a genuine issue of material fact in the standard of care exhibited by the Appellees and because Drayden's claim under the Child Wrongful Death Statute (CWDS) was time-barred. On December 27, 2012, Appellants responded, designating an affidavit by its expert witness, Gary Brickner, M.D. (Dr. Brickner). Reviewing the same records and materials previously tendered to the Panel, Dr. Brickner concluded that the medical care and treatment rendered by Appellees to Stafford failed to

3

comply with the appropriate medical standard of care and was deficient for, at least, the

following reasons:

> a. On October 16, [Stafford] had an eight hour hospital stay at which time the medical care and treatment failed to include appropriate laboratory testing and a 24 hour urine study which could have provided indications of impending or existing maternal/fetal complications and risk.
>
> b. On November 1, a biophysical profile was performed which, if performed properly, should have predicted the chances of fetal survival for up to a week thereafter. It is my opinion that the baby most probably expired between November 2 and November 4. Consequently, there is medical reason to believe that the biophysical profile was performed or interpreted, improperly.
>
> c. On November 1, a fetal non-stress test or other appropriate evaluation of the fetal heart rate pattern should have been performed based on [Stafford's] background/history and reduced fetal movement, and was not.
>
> d. Given the condition of [Stafford] on November 1, a biophysical profile of 8 out of 8 is a deviation from the standard of care because it left off a critical index, the non-stress test.
>
> e. It was a deviation from the standard of care for [Stafford] given her report of decreased fetal movement, to have been sent home from the office for the weekend on November 1 with an 8 out of 8 biophysical profile without conducting a non-stress testing or other fetal heart rate evaluation.

(Appellants' App. p. 99). Appellees deposed Dr. Brickner on June 3, 2013.[2]

On July 1, 2013, Appellees, besides filing a joint reply to Appellants' Response,

also filed a second motion for summary judgment, as well as a designation of evidence,

to which Appellants responded. On November 15, 2013, the trial court conducted a

hearing on the motions for summary judgment. On January 2, 2014, the trial court

---

[2] Appellees designated Dr. Brickner's deposition with their motion for summary judgment as "the entire [d]eposition of [Dr. Bickner], including, but not limited to []." (Appellants' App. p. 112). As Appellees designated the complete deposition, its entirety may be available for our review. *See generally Filip v. Block*, 879 N.E.2d 1076, 1081 (Ind. 2008).

4

granted Appellees' motion, concluding that there was no genuine issue of material fact as to Dr. Szymanski and GYN, and to the extent necessary the unnamed physician, Joseph Smith, M.D. (Dr. Smith), even though Dr. Smith had never been named as a party to the action.

Appellants now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . . , or if the undisputed facts support conflicting reasonable inferences. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009).

In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must

show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

We observe that, in the present case, the trial court entered findings of fact in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *See id.* However, such findings offer this court valuable insight into the trial court's rationale for its decision and facilitate appellate review. *Id.*

## II. *Dr. Szymanowski*

Appellants contend that the trial court improperly entered summary judgment in favor of Dr. Szymanowski. Relying on Dr. Brickner's affidavit and deposition, Appellants assert that a genuine issue of material fact existed which precluded the entry of summary judgment.

Under Indiana law, once the defending parties—as here—"designate the opinion of the medical review panel finding that the defendants exercised the applicable standard of care, the plaintiff must generally present expert opinion testimony to demonstrate the existence of a genuine issue of material fact." *Boston v. GYN, Ltd*., 785 N.E.2d 1187, 1190 (Ind. Ct. App. 2003), *reh'g denied*, *trans. denied*. Because of the complexity of medical diagnosis and treatment, "substantive law requires expert opinion as to the existence and scope of the standard of care which is imposed upon medical specialists and as to whether particular acts or omissions measure up to the standard of care . . .

6

Before the trier of fact may confront the factual question [of negligence] the issue must be presented and placed in controversy by reference to expert opinion." *McGee v. Bonaventura*, 605 N.E.2d 792, 794 (Ind. Ct. App. 1993).

In an effort to rebut the Panel's unanimous decision that Dr. Szymanowski met the appropriate standard of care in his medical consultations with Stafford, Appellants point to Dr. Brickner's affidavit, opining that on November 1st an insufficient biophysical profile was performed or interpreted improperly. Although the affidavit is silent on which physician conducted the biophysical appointment, Appellants maintain that Dr. Brickner's designated deposition clarifies that Dr. Szymanowski was involved in Stafford's care on that particular day.

In his deposition, Dr. Brickner affirmed that "[m]y basic criticism of the care is that it was the only test done on that patient, which given her presenting situation that day, [] was insufficient as a way of assuring fetal well-being." (Appellants' App. p. 137). Specifically, Dr. Brickner laments the absence of a non-stress test that is included in the "true biophysical profile." (Appellants' App. p. 136). Although Dr. Brickner acknowledged that a biophysical profile can be compiled in varying ways—both with or without a non-stress test—the inclusion of the non-stress test depends on "the problems the patient presents with at that given point in time." (Appellants' App. p. 137). Not every pregnancy requires a biophysical profile; not every pregnancy that includes a biophysical profile necessarily mandates a non-stress test. Because Stafford presented with "chronic hypertension" and "superimposed preeclampsia," Dr. Brickner recognized that "[o]n November 1st, the patient in front of you is a much different patient than the

7

patient who is otherwise okay and you're watching them twice a week with a biophysical. And that's why the standard of care in this particular case is different[.]" (Appellants' App. p. 139).

"[G]iven the demise [of the fetus] shortly [after the biophysical profile was created]," Dr Brickner felt that "there's certainly reason to believe [the biophysical profile] might have been misinterpreted, as the occurrence of that [demise] is pretty rare." (Appellants' App. p. 141).

Although the parties concede that Dr. Szymanowski was involved in Stafford's care on November 1st, the record is less conclusive on the physician in charge of the disputed biophysical. Specifically, the following colloquy occurred during the deposition:

> [Appellees' Attorney]: Is it your understanding that the biophysical profile was performed by Dr. Szymanowski?
> [Dr. Brickner]: It's not clear from the records. I don't know who performed it. Though he noted them, I'm not able to find any form where he was listed, other than the flow sheet.
> [Appellees' Attorney]: So you're unaware if he was actually doing it or if he was doing it in conjunction
> [Dr. Brickner]: Yes.
> [Dr. Brickner]: I'm only aware of the results. I do not know who performed it or even when it was performed actually. I'm assuming it was performed that day, but I'm not certain of that either.

(Appellants' App. p. 141).

Moreover, even though Stafford was sent home on November 1st despite manifesting symptoms of high blood pressure and decreased fetal movement, Dr. Brickner acknowledged that Stafford had been informed to report any decreased fetal

movement and she had a responsibility to contact the hospital if such lack of movement was noted during the weekend after her November 1st appointment.

As Dr. Brickner's testimony fails to establish that Dr. Szymanowski conducted and interpreted the perceived insufficient biophysical or otherwise failed to apply the appropriate standard of care in his treatment of Stafford, we conclude that the Panel's unanimous opinion was not rebutted and no genuine material issue of fact exists. *See Boston*, 785 N.E.2d at 1190. Therefore, we affirm the trial court's summary judgment in favor of Dr. Szymanowski.

### III. *Corporate Appellee, GYN*

During Dr. Brickner's deposition, it became clear that besides his comments about Dr. Szymanowski, many of Dr. Brickner's concerns about an insufficient standard of care were directed towards Dr. Joseph Smith (Dr. Smith). Specifically, Dr. Brickner opined that Dr. Smith omitted to follow up on a glucose screen ordered on October 10, 2007, which indicated a high blood sugar level. According to Dr. Brickner, Dr. Smith's failure to decrease Stafford's sugar level contributed to Drayden's stillbirth. Even though Dr. Smith was not named in his individual capacity in the suit and his conduct was not evaluated by the Panel, Stafford now relies on the principles of vicarious liability to claim that GYN should be held responsible for Dr. Smith's perceived failures in the appropriate standard of care. The trial court, issuing summary judgment in favor of GYN, concluded

> [e]ven assuming that Dr. Smith should be considered to be a principle [sic], partner, employee, or agent of GYN, again, Dr. Smith's conduct was never reviewed by a medical panel and his conduct cannot be imputed to GYN on the basis of Dr. Brickner's opinions. The procedure for determining whether a breach of the standard of care occurred requires a review by a

9

> medical review panel as to the conduct about which [Stafford] complains. While not liked by [Stafford] for obvious reasons, the Indiana legislature has established certain gatekeeper requirements that prevent pursuit of a medical malpractice claim in state court until the Medical Review Panel has made its determination. This statutory requirement not having been met, no liability can be established against Dr. Smith or against GYN for Dr. Smith's conduct.

(Appellants' App. pp. 19-20).

Although we have previously recognized in *Columbus Regional Hospital v. Amburgey*, 976 N.E.2d 709 (Ind. Ct. App. 2012) and *Helms v. Rudicel*, 986 N.E.2d 302 (Ind. Ct. App. 2013) that an agency relationship between a physician provider and a hospital or health care group can establish vicarious liability under a theory of *respondeat superior*, these cases are readily distinguishable as the individual physicians in *Helms* and *Amburgey* had been individually named as defendants and their actions had been evaluated by the Panel. Here, we are asked to analyze whether a health care provider can be held vicariously liable for the perceived acts of medical malpractice committed by its agent-physician when the physician's conduct was never reviewed by the medical review panel. We hold that it cannot.

Indiana's Medical Malpractice Act (the Act) is a procedural mechanism for claims of medical malpractice. *Ind. Patient's Compensation Fund v. Patrick*, 929 N.E.2d 190, 193-94 (Ind. 2010). The Act requires, absent certain exceptions not applicable herein, that before a malpractice claim is pursued in court, it must be presented to a medical review panel in a proposed complaint. I.C. § 34-18-8-4. The panel is directed to issue an expert opinion "as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care in

10

the complaint." I.C. § 34-18-10-22(a). Until the panel issues its opinion, the trial court has no jurisdiction to hear and adjudicate the claim. *Putnam Cnty. Hosp. v. Sells*, 619 N.E.2d 968, 970 (Ind. Ct. App. 1993). As such, the review and expert opinion by a medical review panel is a pre-requisite for filing a medical malpractice claim.

In their proposed complaint to the Panel, Appellants asserted that Dr. Szymanowski and GYN were negligent in the care they had provided Stafford during her pregnancy. A medical review panel was convened and on May 30, 2012, the Panel issued its opinion that Appellees did not fail to meet the applicable standard of care and that their conduct was not a factor in the resultant damages claimed by Appellants. Although aware of Dr. Smith's involvement in Stafford's care, Appellants never requested the Panel to review Dr. Smith's treatment of Stafford during her pregnancy and no claim as to Dr. Smith's liability was ever tendered for evaluation.[3]

In an effort to now place Dr. Smith's treatment in controversy, Appellants rely on *respondeat superior* to hold GYN, who was presented to the Panel, liable for the conduct of a physician that was not analyzed by the Panel. To allow the introduction of a perceived breach in Dr. Smith's standard of care by virtue of his association with the named corporate health care provider, GYN, would enable Appellants to bypass the procedural requirements of the Act and would create a potential avenue for patients to sue their physicians for medical negligence by simply presenting the perceived lack of care in

---

[3] Although we agree with Appellants that in reaching his conclusion that Dr. Smith's standard of care was insufficient, Dr. Brickner relied on the same materials that were tendered to the Panel, neither the Panel, nor Dr. Brickner's affidavit indicate that they reviewed the materials in light of a contested liability with respect to Dr. Smith. Rather, the first time Dr. Smith's standard of care is questioned is during Appellees' deposition of Dr. Brickner.

11

the corporate entity before the Panel and, upon completion of the Panel process, pursue an action against any individual physicians. Such a procedure, which would strip a physician's protections against the escalation of malpractice claims under the Act, was neither intended nor anticipated by the legislature. *See, e.g., Detterline v. Bonaventura*, 465 N.E.2d 215, 217-18 (Ind. Ct. App. 1984), *reh'g denied, trans. denied* ("The obvious purpose of the [Act] is to provide some measure of protection to health care providers from malpractice claims, thus to preserve the availability of such professional health care services to the community."). We affirm the trial court's summary judgment in favor of GYN.[4]

## IV. *Child Wrongful Death Statute*

In addition to her own injuries, Stafford also seeks to recover for the wrongful death of Drayden as a viable fetus at the time of his death on November 6, 2007. Until recently, the CWDS only permitted recovery for a child born alive, not for a viable fetus that died *in utero*. *See, e.g., Bolin v. Wingert*, 764 N.E.2d 201 (Ind. 2002). Effective July 1, 2009, the legislature modified this established rule and re-defined "Child" under the statute to include any fetus that had attained viability.[5] In addition to the modification of "Child" under the CWDS, the legislature also included a new section which specifically stated that the 2009 amendment only applied to claims which accrued after June 30,

---

[4] Because we decide this issue on the fact that the Panel never reviewed Dr. Smith's conduct, we do not decide whether the designated evidence established a genuine issue of material fact that an agency relationship existed between Dr. Smith and GYN.

[5] *See* P.L. 129-2009, sec. 8, 2009, Ind. Acts 1172 (codified as amended at Ind. Code § 34-23-2-1).

2009. *See* I.C. § 34-23-2-0.1. As such, the amendment became effective two years after the death of Drayden and a month after Stafford filed her initial proposed complaint.

Combining the Medical Malpractice Act and the statutory limitations of the CWDS, Appellants maintain that

> the explicit provisions of the Indiana Medical Malpractice Act expressly state that [Stafford] had no legal right to file a cause of action for CWDS in the Indiana court system until after she had (1) presented the claim to a medical review panel and (2) an opinion had been rendered by that panel. In this case, the opinion of the medical review panel was not issued until May 30, 2012, which is nearly three years after the new definition of "child" became effective under the CWDS.

(Appellants' Br. p. 20) (citing to I.C. § 34-18-8-4).

However, the Medical Malpractice Act does not create or establish the medical malpractice claim; rather, it only imposes procedural requirements on the prosecution of them. *Chamberlain v. Walpole*, 822 N.E.2d 959, 961 (Ind. 2005). One of the requirements of the Act is that a proposed medical malpractice complaint first be filed with the Department of Insurance for review by a medical panel before the complaint is filed in court. *See* I.C. § 34-18-8-4. The substantive claim or cause of action at stake in medical malpractice cases is the common law claim of negligence by a health care provider proximately causing personal injury or death. *Ellenwine v. Fairley*, 846 N.E.2d 657, 660 (Ind. 2006).

Turning to these substantive requirements of the claim, our supreme court clarified in *Ellenwine* that any wrongful death claim under the CWDS must be brought no later than two years after the date of death. *Ellenwine*, 846 N.E.2d at 667; I.C. § 34-23-1-1. As such, the claim first arises or accrues at the death of the child. *See id*. Drayden was

stillborn on November 6, 2007. Thus, the cause of action under the CWDS accrued that same day, almost two years before the amendment took effect. Consequently, as the statutory amendment was not yet in effect, Appellants cannot recover for the wrongful death of a viable fetus.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court properly concluded that Dr. Brickner's testimony did not create a genuine issue of material fact as to the liability of Dr. Szymanowski; (2) GYN cannot be held vicariously liable for the perceived acts of medical malpractice committed by Dr. Smith when Dr. Smith's conduct was never reviewed by the medical review panel; and (3) the trial court properly concluded that no recovery exists for the 2007 death of a child not born alive under the Child Wrongful Death Statute, as amended.

Affirmed.

ROBB, J. and BRADFORD, J. concur

14